YOUNG &c.<br>vs.<br>WISEMAN.

---

## Castleman vs. Combs &c.

Error to the Henry Circuit; HENRY DAVIDGE, Judge.

*Statutes.    Sales of lands in adversary possession.    Practice in chancery.    Sales pendente lite.*

Judge MILLS delivered the opinion of the court.

Jonah Combs sold to John Castleman about two hundred acres of land, and gave his bond for a conveyance on the 26th of October, 1818. Combs had held possession of the land from the year 1793, having taken it under a Mr Webb, but how Webb claimed it, does not appear. John Bowman, during the possession of Combs, and before the sale to Castleman, brought his ejectment, and recovered a judgment against Combs for the land, and Combs then bought of Bowman, and took his bond to convey the title when the purchase money was paid. This bond of Bowman, Combs also assigned to Castleman, when he sold to him, in addition to giving his own bond to convey, and Combs placed Castleman in possession of the land, and he made improvements thereon.

Castleman brought his bill in equity to get credits on the purchase money, which he claimed against Combs, and also for a specific performance of the contract, against both Combs and Bowman, and amended his bill, praying a rescission of the contract. The circuit court set aside the contract, decreed Combs to restore the purchase money, and pay for

EJECTMENT.<br><br>Case 51.<br><br>May 7.<br><br>Statement of the facts.

Rescission of the contract, and surrender of possession.

CASTLEMAN
vs.
COMBS &c.

Case formerly
here referred
to.

Castleman's

improvements, and Castleman to pay rents and restore the possession. Castleman and Combs both acquiesced in this decree, and Castleman in obedience thereto restored the possession to Combs.

But Bowman and others, who were assignors of the notes given by Castleman to Combs for the purchase money for the land, were dissatisfied with the decree, and a writ of error was sued out, in the name of all the defendants, to reverse it. This court reversed the decree, and directed the contract to be enforced, as will be seen by the reported case in 4 Lit. Rep. 303, to which we refer for a more accurate and circumstantial history of this case.

On the return of the opinion and mandate of this court to the court below, some further proceedings were had and a final decree entered, which will be hereafter noticed.

Castleman being thus compelled by the decree of this court to abide by the contract, and pay for the land, wished the possession again restored to him, as he was indubitably entitled to it, on the decree affirming the contract.

But he did not find Combs as ready to restore the possession in conformity to the opinion of this court, as Castleman had been in obedience to the decree of the court below. For Combs, about one month after the decree of this court was rendered, had conveyed seventy-six acres of the land to William Combs and John B. Hancock, being the most valuable part including the improvements, and although William had previously lived with Jonah, yet he entered after this deed in a new character, as he contends in proof in this cause, and that Jonah abdicated his authority as lord of the soil, in favor of William, who now became family ruler; and although Jonah was first master of the family, and William the boarder, or guest, now William becomes master, and Jonah the guest, and William professes under his deed to hold absolutely and adversely against the world.

Castleman having paid up to Bowman the purchase money, which Jonah Combs was bound to pay;

and holding the assignment of Bowman's bond to **CASTLEMAN** Jonah Combs, received from the executors of John **vs.** Bowman (he having departed this life and author-**COMBS &c.** ized his executors by will to convey the estate,) a evidence of conveyance of the land, and brought this action of title. ejectment against both Jonah and William Combs and Hancock for the land.

On the trial he gave in evidence Bowman's patent, his conveyance from Bowman's executors, the record of the aforesaid chancery suit between the parties, including all the writings which had passed between them, as well as the different decrees which had been rendered.

The defendants gave in evidence the long posses- Combs' ion of Jonah Combs, with a patent in the name of grounds of John May, and some conveyances to Jonah Combs defence. by others professing to hold under May, the conveyance to William Combs and Hancock, and the professed adverse possession of the two latter.

The court below, at the instance of the defendant's Instructions counsel, instructed the jury—"that if they believed of the circuit from the evidence that the defendant William Combs court. was in the possession of the seventy-six acres contained in the deed of Jonah Combs to said William Combs and Hancock, and of no other part of the land embraced by the patent of Bowman, before and at the date of the deed of conveyance from the executors of Bowman to the lessor of the plaintiff, and that said William held adversely to the claim of said Jonah and all others, the said deed from the executors to the lessor did not pass to him such title as to enable him to maintain this action against said William Combs."

Under this instruction the jury found for the de- Verdict and fendants, and judgment was rendered accordingly. judgment for Castleman excepted to the opinion of the court, and defendants. has brought this question before us by writ of error.

As the deed of Jonah Combs to William Combs is Instruction dated the second day of January, 1824, and the deed on the act from the executors of Bowman to Castleman, the sale of land lessor of the plaintiff, is dated the 18th of March, in the ad-1825, and the act of assembly entitled "An act to re- sion of others.

CASTLEMAN
vs.
COMBS &c.

vive and amend the champerty and maintenance law, and more effectually to secure the *bona fide* occupants of land within this commonwealth,"—Session acts of 1823, p. 443 was passed on the 7th January, 1824, and took effect on the 1st of July, 1824, we have no doubt that the motion made, and the instruction given by the court, was intended to bring the case of the lessor of the plaintiff within the purview of that act, and to destroy the effect of his title in consequence thereof. The first section of that act provides "that no person shall sell or purchase by deed of conveyance, or bond, or executory contract, any pretended title or right to land, of which any other person than such vendor or vendee shall, at the time of such sale or purchase, have possession adverse to the right or title so sold or purchased, and every deed, conveyance bond, or contract, made, executed or entered into, in violation of this section, shall be void; and no right of action shall accrue to either party under such deed, conveyance, bond, or contract."

Act prohibiting the sale of land in adverse possession, does not apply when the occupant holds in such manner that he is bound to surrender the possession to the vendee without questioning his title.

Allowing the defendants below, or either of them, the benefit of or shelter from this act, or to protect themselves by it as a shield in this action, is so repugnant to the moral sense of all who are conversant with the history of the transaction, that we should hesitate long before we should permit it. We cannot consent to dress up William Combs, with all his boasted independence of tenure, or his co-tenant Hancock, or his former landlord, but now humble guest, Jonah, in the habiliments, of an adverse possession, within the meaning of the act. Indeed, to do so, would be highly indecorous to the legislative branch of the government, and would convict them of the intention of weaving a covering for stratagem, cunning and fraud, which is utterly inadmissible. We cannot presume that the legislature intended to dissolve the strong ties of contracts, or the equitable or legal relations which then might, or hereafter may exist between parties, relative to the possession of land, and especially those relations or rights of possession which were, or shall be, fixed and settled by the judicial tribunals. We might as well say, that every tenant for years, might, in viola-

Castleman
vs.
Combs &c.

tion of his lease, attorn to a new landlord, or acquire a new title, and then declare independence of his landlord and thus become an adverse possessor; or that every vendor possessing the land, and bound to perform his contract by paying the money and accepting a title, and every vendor bound to give up possession and convey the land to his vendee, might acquire a new title, or convey his title to another, who should proclaim adverse possession, as to suppose, that Jonah Combs, or any person holding under him, could do so in this action. We have no doubt, that all their different relations with regard to title, are left between contracting parties, since the act, in the same situation in which they were before; and wherever there is such privity of estate between two, that one is looking to the other for a conveyance or possession, under a solemn contract or the adjudication of a court of competent jurisdiction, their relation is not affected, and that the statute is designed to embrace the case of claimants on one side and possessors on the other, of strangers in estate, or such possessors as can, without violating the principles of law or conscience, hold adversely to the claimant, who holds a title for the land.

Where, after the decree of the circuit court, rescinding the contract, the vendee was in possession, surrenders to the vendor, when that decree is reversed here, and the contract affirme', the vendee is entitled to restoration.

By attending to the case of Jonah Combs, it will be found that he has not one feature of an adverse possessor to Castleman. We have not thought it necessary to look with a critical eye into the title of Castleman, derived from Bowman's executors. Whatever that title may be, we know it was derived through Jonah Combs, and that Jonah Combs was bound, both by his contract and the decree of this court not only to allow Castleman the title of Bowman, but also his own conveyance, carrying with it every other title he might hold; and as he had taken the possession back from Castleman, in compliance with the first decree, he became bound on the reversal of that decree, and a decree enforcing the contract, to restore back that possession and account for the profits. Indeed it might be plausibly contended that Jonah Combs ought to be estopped to question Castleman's title, or gain say his right of possession, by analogy to the principle recognized

CASTLEMAN
vs.
COMBS &c.

by this court, that a vendee of land who had taken possession from the vendor, and then has recovered from that vendor his purchase money back, cannot be permitted to question his vendor's title in an ejectment to regain the possession by the vendor. But it is not necessary that we should decide this point, as Castleman appears to have title derived through Jonah Combs, and to have the strongest claims to the possession, both in law and conscience, sanctioned by a decree of this court.

*In such case, on the return of the cause to the circuit court, the chancellor ought to have the possession restored, and the matter of rents &c. all settled as a part of the original cause—not send the parties to law to finish the chancery suit.*

We cannot but regret that the case of the lessor of the plaintiff in the chancery suit, after the return of the decree of this court to the court below, has been so badly managed, as to give rise to this suit, and produce so much delay and expense attending it. In that case, we dismissed Bowman and Smith and T. & W. Smith the assignees of Combs from the cause. We also laid down the principles on which the accounts of Castleman and Jonah Combs were to be settled, leaving the court below, by the ordinary usages of courts of equity, to take this account—to ascertain whether any thing remained due of the purchase money from Castleman to Combs—and to provide for its payment, and to decree Castleman a title as his original bill required. It was also competent for that court, to inquire into the possession *ad interim*, to take an account of the mesne profits, and to place the possession where it ought to be. For all these purposes that cause was open, and on all these points the chancellor should have acted without contravening the decree or opinion of this court. If these points had been taken up and acted upon by the chancellor, he would have set this matter right, at once, and have cut off the necessity of this action at law. Instead of this, that court, after dismissing Bowman and Smith and T. & W. Smith, proceeded, between Castleman and Jonah Combs, to decree that if the balance was this way or that, then such and such decree should be made, adopting the directory language of this court in settling the principles of the account, for a certain decree after the account was settled, and then gave to Castleman his costs, and stopped short of giving him the title or possession, to both of which he was en-

titled; and as Jonah Combs, or his assignees, were re- ceiving the interest on the purchase money, so Castleman was entitled to the profits of the land. From this defect in the decree of the chancellor, this cause has arisen. But one thing is evident, that nothing which has been done by the chancellor in that cause, or omitted to be done, has released Jonah Combs from the indisputable obligations under which he lies, both in law and conscience, to restore to Castleman the possession of this land, which he got from him under an erroneous decree, the reversal of which bound him to give it back.

Having ascertained the situation of Jonah Combs, and shown that he has no shelter from the act of assembly on which he relies, we will attend more particularly to the case of William Combs and Hancock, and ascertain whether they are in a better situation.

We cannot help perceiving some symptoms of fraud in the title which they set up, and entertaining some suspicions that their deed of conveyance was executed to defeat the decree of this court, or the decree which the court below was bound to render in pursuance of the mandate from this. Before that conveyance, Jonah Combs had been holding the possession securely, as he had received it from Castleman under the decree of the court below. Then, he was master and owner, and William Combs his boarder. During this quiet period, the decree of this court was announced, on the 1st of December, 1823, reversing the decree of the court below, and carrying some alarm to his peaceful abode. The consequence, which must follow, was a loss of his home, by a restoration of it to Castleman, to whom he had sold it. It presented the enquiry, how was this event to be avoided. Within about one month afterwards, he conveys to William Combs and Hancock, who, at the same time, become not only the owners of the land, but of every thing else which he possessed. The tables are turned. Jonah Combs resigns the reins of government, and William Combs, the late subject, becomes ruler, and Jonah steps down to the degree of a mere family subject, liable to be turned out when his new landlord pleases; but

notwithstanding this sudden change, harmony seems still to prevail in the habitation, and the parties, in their new relation, seem to move on with as little inconvenience as before, and no one but Castleman is left to feel any disagreeable consequences from this revolution in the former order of things.

But as an enquiry into this matter was precluded by the decision of the court below, and there is no express proof, but only presumptive evidence, that William Combs and Hancock actually knew of the decree of this court, and entered into a combination with Jonah Combs to avoid it, we will not enquire further into this matter, and will leave it open for further enquiry, if necessary, on a new trial in the court below.

And we will now take it for granted, that there was no actual fraud, and that both William Combs and Hancock acted innocently and fairly in their purchase from Jonah; still we shall see that their conveyance under which they claim, is void and cannot operate in the slightest degree to the prejudice of Castleman.

*Conveyance by the vendor, who had received the possession after a decree of the circuit court rescinding the sale made before the entry of the mandate of this court reversing the decree and affirming the sale, is a transaction pendente lite, and does not affect the vendor's right to the possession.*

It was a conveyance *pendente lite*, and is affected with all the consequences of such a deed. The decree of this court opened afresh the controversy between Castleman and Jonah Combs, and directed it to progress, and inevitably fixed the principles on which it should be decided. It was therefore *lis pendens et florens*—in proper vigor and of the most dangerous character. It not only told all purchasers that there was a controversy, but also disclosed how the contest must end—that Castleman must get the land and possession. The rule that a purchaser, under such circumstances, must be affected and can take nothing by his deed, is so well known, that it is unnecessary now to dwell upon it. It has been ably investigated and elucidated by Chancellor Kent in Murray vs. Ballou, 1 John. Chy. Rep. 566; Murray vs. Lelburne, 2 John. Chy. Rep. 441; Murray vs. Finister, ibid. 155; Heatty vs. Finley, ibid. 158; Green vs. Slater, 4 John. Chy. Rep. 38. It is a case where the maxim *caveat emptor* emphatically and effectually applies. It is a stub-

born, iron rule, absolutely necessary to the due administration of justice. For without it, controversies could never end, and courts could never give the relief that justice and equity required. It would be only for a failing litigant to place the subject matter of the contest into the hands of another by sale, and then the controversy must begin anew, and when that was about closing, another transfer would again revive it, and so on in succession, till remedy by suit would only mock the pursuer. It could never have been the intention of the legislature, in the act, on which the dependents rely, to destroy this rule of the utmost necessity, and to allow a purchaser of this character, to assert his independence and proclaim adverse possession, and thus to defeat forever a plaintiff in the recovery of his just and conscientious demands.

The judgment of the court below is, therefore, deemed erroneous.

It must be reversed with costs, the verdict be set aside, and the cause be remanded for new proceedings not inconsistent with this opinion.

*Crittenden* for plaintiff; *Monroe* for defendants.